## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA, *et al.*,

        Plaintiffs,

        v.

WALGREEN CO., JAMES G.
KULEKOWSKIS, JR., and
CHRISTOPHER G. HAYES,

        Defendants.

Case No. 14-cv-1558

Judge John Robert Blakey

## MEMORANDUM OPINION AND ORDER

Relators and Plaintiffs Sarah Castillo Baier (Castillo-Baier) and Rita Svendsen Baier (Svendsen-Baier) (collectively Relators) have brought a *qui tam* action under the False Claims Act (FCA), 31 U.S.C. § 3729 *et seq.*, (Counts I & II) and its Illinois counterpart, the Illinois False Claims Act (IFCA), 740 ILCS Comp. Stat. 175/1 *et seq.*, (Counts III & IV) on behalf of the United States and the State of Illinois. [65].

Relators sue Defendants Walgreen Co. (Walgreens) and James G. Kulekowskis, alleging that they induced patients and providers to use a Walgreens specialty pharmacy location by: (1) routinely and systematically waiving copayments for Medicaid and Medicare patients; and (2) automatically refilling prescriptions for these same patients. *Id.* ¶¶ 3, 185. On September 27, 2018, Defendants Walgreens and Kulekowskis moved to dismiss Relators' Second Amended Complaint (SAC). [70].

On August 7, 2018, the United States and State of Illinois (collectively the Government) filed a Joint Complaint in Intervention (JCI) against Defendants Walgreens, Kulekowskis, and Christopher G. Hayes[1] pursuant to the FCA (Counts I & II) and ICFA (Counts III & IV), alleging that they automatically refilled prescriptions for Illinois Medicaid patients at the same Walgreens specialty pharmacy at issue in Relators' SAC. [64] ¶¶ 1, 3. The Government also brought claims for common law fraud (Count V), unjust enrichment (Count VI), and payment by mistake (Count VII)[2] based upon these same allegations. [64] ¶¶ 104−11. The Government, unlike Relators, did not bring claims based upon any copayment waivers. *See generally* [64]. On September 27, 2018, Defendants Walgreens, Kulekowskis, and Hayes moved to dismiss the Government's JCI. [68].

For the reasons explained below, this Court grants both motions to dismiss, [68] [70].

## I.    BACKGROUND

The following facts come from the Government's JCI, [64], and Relators' SAC, [65].

### A.    The Parties

The federal government and state of Illinois jointly fund and administer the Medicare and Medicaid programs in Illinois. [64] ¶¶ 7−8; [65] ¶¶ 21, 29−33.

---

[1] Only the Government named Hayes as a Defendant; Relators' SAC makes no mention of Hayes. *See* [65] at 1 (naming only Walgreens and Kulekowskis as defendants). For clarification purposes, when discussing the Government's claims, this Court uses "Defendants" collectively to include Defendant Hayes. When discussing Relators' claims, however, this Court excludes Defendant Hayes from any collective mention of "Defendants."

[2] The Government brings its payment by mistake claim, Count VII, only against Defendant Walgreens.

Defendant Walgreens is an Illinois corporation authorized to do business in the United States, Puerto Rico, and Guam, with its corporate office in Deerfield, Illinois. [64] ¶ 9. Walgreens operates a chain of retail drugstores that sell, among other items, prescription drugs. *Id*. In addition to over 8,000 retail stores, Walgreens owns and operates more than 700 specialty pharmacies through its Specialty Pharmacy division. *Id*. This division provides specialized medication for complex, genetic, rare, and chronic health conditions. *Id*. This case concerns Walgreens' C&M Specialty Pharmacy (C&M) located in Glenview, Illinois. *Id*. ¶ 3.

Defendant James G. Kulekowskis, Jr. is a Doctor of Pharmacy (Pharm.D) and licensed pharmacist in Illinois and Florida. *Id*. ¶ 10. At all times relevant to this case, Kulekowskis worked as the pharmacy manager of C&M, with responsibility for overseeing all business and operations there. *Id*. Defendant Christopher Hayes is a licensed pharmacist. *Id*. ¶ 11. At all times relevant to this case, Hayes worked as the supervisor of all pharmacists and technicians employed at the C&M location. *Id*. Both Kulekowskis and Hayes reside in Illinois. *Id*. ¶¶ 10−11.

Relator Castillo-Baier resides in Illinois and worked for Walgreens from July 2002 through July 2017. [65] ¶ 15. She holds a pharmacy technician certification and began working as a Senior Certified Technician at Walgreens in 2007. *Id*. In May 2013, Walgreens transferred Castillo-Baier from one of its retail pharmacy locations in Arlington Heights to C&M. *Id*. ¶ 16. She worked as a pharmacy technician at C&M from May 2013 through December 2013, after which Walgreens transferred her to C&M's finance department. *Id*. ¶ 17. Castillo-Baier worked in

C&M's finance department from January 2014 until she resigned, effective July 5, 2017. *Id.*

Relator Svendsen-Baier also resides in Illinois and worked for Walgreens from February 2002 until November 2013. *Id.* ¶ 18. She worked as a Certified Pharmacy Technician until November 2011, when she became a student pharmacist/pharmacy intern and no longer required certification. *Id.* Svendsen-Baier worked with Defendant Kulekowskis for approximately one year between 2003 and 2004, and from time to time between May and December 2010, at C&M. *Id.* ¶ 19.

### B. The Medicaid Program

The Medicaid Program, 42 U.S.C. § 1396 *et seq.*, is a government health insurance program funded jointly by the federal and state governments to assist people and families with low income and limited resources. [64] ¶ 21. The Centers for Medicare and Medicaid Services (CMS), within the United States Department of Health and Human Services (HHS), administers Medicaid on the federal level. *Id.* ¶¶ 22–23. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services, and administrative and operation procedures. *Id.* ¶ 23. The state directly pays the providers of Medicaid services and obtains the federal share of the payment from accounts drawn on funds of the United States Treasury. *Id.*

Providers of prescription drugs for Medicaid patients who participate in the Medicaid program are eligible for reimbursement for covered prescriptions. *Id.* ¶ 24. To enroll in the Illinois Medicaid program, pharmacies must submit an enrollment

application that contains, in relevant part, a certification that "all of the information provided in this application process is true, correct and complete and that the enrolling provider is in compliance with all applicable federal and state laws and regulations." *Id.* ¶ 26. Once enrolled in the Illinois Medicaid program, each pharmacy must sign the Illinois Medicaid Provider Agreement, which provides, in part, that providers will comply with all current and future program policy and billing provisions. *Id.* ¶ 27. Defendant Walgreens, doing business as C&M Pharmacy LLC, executed such a Provider Enrollment Agreement with the Illinois Medicaid program dated July 1, 2006. *Id.* ¶ 28.

Claims submitted to Illinois Medicaid may also be submitted electronically. With respect to electronically-filed claims, the Illinois Medicaid Policy Handbook states, in relevant part:

> Paper claim forms all contain a certification statement, which the provider is required to sign. By signing the form, the provider is attesting to the accuracy of the information contained therein.

> Electronic claims and claims created by the Department do not contain a certification statement, nor is there a way for the provider to sign electronic claims at the time of submittal. Instead, the Department has instituted a post-payment certification as described below.

> A copy of Form HFS 194-M-C, Billing Certification, accompanies each remittance advice which contains an electronically submitted paid service or a service paid as a result of a claim created by the Department.

> It is the responsibility of the provider who provided the service and submitted the claim for payment to review the Remittance Advice and the Billing Certification form attesting the accuracy of the information therein.

> The same signature requirements that apply to the signing of a paper claim, as described in Topic 112.7.1, apply to Form HFS 194-M-C.

[65] ¶ 43.  Form 194-M-C, the billing certification form, contains the following language: "I understand payment is made from State and Federal funds and any falsification or concealment of a material fact may be cause for prosecution or other appropriate legal action." *Id*. ¶ 45.

According to Relators, Walgreens received Form 194-M-C in connection with each claim submitted electronically to Illinois Medicaid. *Id*. ¶ 46.

### C.  The Medicare Program

The Medicare Program, 42 U.S.C. § 1395 *et seq*., is a government health insurance program funded jointly by the federal and state governments to assist the elderly and disabled. *Id*. ¶ 29.  CMS administers Medicare on the federal level. *Id*. ¶ 30.  Medicare reimburses health care providers for covered services given to Medicare patients. *Id*. ¶ 33.  In doing so, Medicare determines what types of services are covered and therefore reimbursable, and at what rate it will reimburse the covered service. *Id*.  Providers enrolled in the Medicare program agree to submit claims only for medically and reasonably necessary services covered under the program, and to only seek compensation to which the provider is legally entitled. *Id*.

Pharmacies such as Walgreens who wish to enroll in Medicare must complete Medicare Enrollment Application – Clinics/Group Practices and Certain Other Suppliers, Form CMS-855B. *Id*. ¶ 34.  Form 855B contains the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this supplier.  The Medicare laws, regulations, and program instructions are available through the Medicare contractor.  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying

> with such laws, regulations, and program instructions (including, but
> not limited to, the Federal anti-kickback statute and the Stark law), and
> on the supplier's compliance with all applicable conditions of
> participation in Medicare.

*Id.* ¶ 35.

### D.    C&M Operating Structure

As a specialty pharmacy for complex, genetic, rare, and chronic health conditions, C&M provides medications that are often much more expensive than medications provided at the pharmacies in Walgreens' retail stores. [64] ¶ 29. C&M provides pharmaceutical services for patients at home as well as patients in medical clinics. *Id.* ¶ 30. For patients in medical clinics, C&M sends their medications or prescriptions directly to the clinic; for home patients, a Walgreens-employed driver, or UPS, FedEx, and/or the U.S. Postal Services will deliver medications or prescriptions directly to the patient. *Id.*

C&M assigns each pharmacist or technician to a particular "department" within the store. *Id.* ¶ 31. These departments include mental health, transplant, HIV, and biologics. *Id.* C&M then categorizes patients into these departments based upon the type of medications they need, and each department fills or refills their prescriptions. *Id.* Accordingly, when a patient needs a prescription entered, the pharmacist or technician for that patient's designated department enters the prescription. *Id.*

### E.    Automatic Refill Allegations

A typical medication prescription requires a patient to take the medication once per day, every day. *Id.* ¶ 32. A typical prescription is written for a 30-day supply

7

of the medication, and each prescription allows for a finite number of refills. *Id.* Thus, a patient taking such medication once per day, every day, will run out of medication after 30 days. *Id.*

Prior to May 1, 2013, C&M refilled Medicaid patient prescriptions under an "automatic refill" or "auto refill" protocol. *Id.* ¶ 33. Under such protocol, the pharmacy automatically refilled prescriptions every 30 days (or other time period depending upon the medication), until all prescribed refills ran out. *Id.*

### 1. April 2013 Provider Notice

On April 24, 2013, HFS issued a Provider Notice to all pharmacies participating in Illinois' Medicaid program advising that effective May 1, 2013, Illinois Medicaid would no longer allow pharmacies to automatically refill prescriptions, and that "[a]ll prescription refills must be initiated by a request from the prescriber, participant, or other person acting as an agent of the participant, e.g., a family member." *Id.* ¶ 2. The Provider Notice also explained:

> The possession of a prescription with remaining refills authorized does not, in itself, constitute a request to refill the prescription. The department will not reimburse a pharmacy for any prescription claim that has been filled using an auto refill process. Any claim for a prescription filled without a request from the prescriber, participant [i.e., the patient], or agent of the participant will be subject to recovery. Claims for prescriptions that have been filled using auto refill and inadvertently billed to the department must be reversed by the pharmacy.

*Id.* According to the Government, the auto-refill prohibition "protects limited government resources from waste and abuse, and also protects public health and safety by preventing prescription drugs from unnecessarily being sent to patients."

*Id.* ¶ 5.  In particular, sending unnecessary prescriptions to patients can result in an individual taking a medication even after his or her provider intended that the prescription be discontinued, or when the prescriber intended a dosage change.  *Id.* Moreover, receiving unnecessary prescriptions could result in the patient selling the medication on the open market.  *Id.*

### 2.    C&M's Reaction to the Provider Notice

According to the Government, the Provider Notice had the potential to negatively impact C&M's pharmacy sales; based upon Illinois Medicaid claims data, Medicaid-covered prescriptions constitute approximately 70% of sales at C&M.  *Id.* ¶ 39.  Thus, C&M faced a significant overhaul in its method of refilling prescriptions, as well as a threat to sales, due to the auto-refill prohibition.  *Id.*  According to the Government, "Defendants" responded to this threat by advising all of its pharmacists and pharmacy technicians to: (1) automatically refill all prescriptions; and (2) falsely enter a notation in the computer system that the provider (such as a nurse in the case of clinic patients) or the patient (in the case of home patients) specifically requested the refill.  *Id.* ¶ 40.  The Government fails to specify which of the three named Defendants—Kulekowskis, Hayes, and Walgreens—made this advisement.  *Id.*

In May 2013—when Castillo-Baier worked at C&M—C&M refill technician Aneta Kuligowska trained Castillo-Baier on the new Illinois Medicaid Auto-Refill Prohibition and "C&M's method for fraudulently getting around the policy."  *Id.* ¶ 41. According to the Government, every day at C&M, the store generated a computer printout showing a list of patients for whom 30 days had passed since the patient's

last prescription was filled.  *Id.* ¶ 42.  Despite the Provider Notice, C&M pharmacists and technicians then auto-refilled each of the prescriptions for patients on the list, regardless of whether the patient or a provider requested a refill.  *Id.*  When a patient or provider did not specifically request a refill for a Medicaid-covered prescription, C&M employees made "false and fraudulent notation[s]" that a patient or a nurse called to request the refill, when in fact, no such refill was requested.  *Id.*  ¶ 43.  And based upon these auto-refilled prescriptions, Walgreens submitted claims for the prescriptions to Illinois Medicaid.  *Id.*

The Government offers C&M pharmacy technician Candice Bundzinski's day-to-day experience as an example of the allegedly fraudulent auto-refill process.  *Id.* ¶¶ 56−61.  Bundzinski served as a pharmacy technician at C&M from December 2013 through August 2014.  *Id.* ¶ 56.  She began each work day by printing out a list generated by the auto-refill system containing 15 pages of patient names.  *Id.* ¶ 57.  From that list, Bundzinski then identified which patients required a prescription refill based upon their 30-day medication cycle.  *Id.*  Bundzinski and other pharmacy technicians would then process these orders and submit all requests for prescriptions to C&M's laboratory.  *Id.* ¶ 58.  But according to Bundzinski, she and other C&M employees only contacted 15 percent of patients to determine whether they actually wanted their prescriptions refilled.  *Id.*

Once she automatically refilled the prescription, Bundzinski then typed a note into C&M's computer system advising that the patient requested the refill, even if she never spoke to the specific patient.  *Id.* ¶ 59.  Based upon C&M's training,

Bundzinski believed these notations to be necessary for audit purposes. *Id*. Bundzinski never saw or otherwise knew of Illinois Medicaid's prohibition of prescription auto-refills during her tenure with C&M. *Id*. ¶ 60.

### 3. C&M's Software System

During this time period, Walgreens allowed C&M to use a computer system not associated with the rest of Walgreens' network. *Id*. ¶ 44. Generally, Walgreens and all of its affiliated stores used the Intercom Plus System, while C&M used a different Citrix-based system called CarePoint. *Id*. Walgreens did not transition C&M to its Intercom Plus System until late 2016. *Id*. According to the JCI, as late as January 2015—over a year after the auto-refill prohibition—C&M's CarePoint system designated all patients, including Illinois Medicaid patients, as participating in C&M's auto-refill program unless a patient specifically opted out of the service. *Id*. ¶ 45.

C&M's computer system automatically marked the initials of the individual logging into the computer and the time and date of that entry. *Id*. ¶ 46. Thus, when a pharmacist or technician entered a note in the computer system that a nurse or patient had requested a refill—in the "disclosure field" of a patient's profile—the computer system placed a date and time stamp on each entry and recorded the initials of the particular pharmacist or technician. *Id*. ¶ 46. According to the Government, even when technicians had not contacted a customer, "Defendants" instructed technicians to input a notation reflecting that they had made contact. *Id*. ¶ 48. The

11

Government does not specify which individual defendants made such instructions. *See id.*

In such situations, technicians input notations such as "RN REQ. REFILLS," and "other non-specific phrases" every 30 days. *Id.* For example, C&M pharmacy technician Suhail Ishaque routinely made a note on his schedule that a patient received Illinois Medicaid, and thus that he needed to notate "Make Disclosure that patient requested" or "Make Disclosure that nurse requested." *Id.* ¶ 49. Ishaque made such notes only for Illinois Medicaid patients. *Id.* ¶ 50.

### 4. Provider Bulletin and C&M's Subsequent Reaction

On October 8, 2014, the Illinois HFS sent Provider Bulletin P-200 14-06 (the Provider Bulletin) to all enrolled pharmacies regarding the Illinois Handbook for Providers of Pharmacy Services (the Handbook), reminding pharmacies of the State's auto-refill prohibition. *Id.* ¶ 52. Shortly after receiving the Provider Bulletin, Defendant Hayes, in his role as a pharmacist and technician supervisor at C&M, gave all C&M pharmacists and technicians a copy of the Provider Bulletin. *Id.* On the first page of the employees' copies Hayes wrote:

> Att: Please read bracketed areas. All refills for [Illinois Department of Public Aid] (only) must be noted in disclosure notes that the patient requested. This note also needs to be added when refilling Medicare B patient meds.

*Id.*

Following the issuance of the Provider Bulletin, Defendants Kulekowskis and Hayes called a meeting on November 14, 2014. *Id.* ¶ 62. The Government alleges that the meeting was triggered in part by C&M's receipt of a government subpoena

requesting information regarding prescription refill practices since May 2013. *Id.* ¶ 62. Four days before the meeting—when C&M first received the subpoena—Hayes sent the following email to all pharmacists and technicians and copied Kulekowskis:

> Subject: re: ILLINOIS MEDICAID PATIENTS
>
> REMINDER:
>
> ALL MEDICAID PATIENTS MUST HAVE A DISCLOSURE NOTE EVERYTIME A MEDICATION IS DISPENSE[D] STATING THAT "PATIENT (or representative) HAS REQUESTED A REFILL/REFILLS FOR (medication 1), (medication 2), (medication 3) AND SO ON. THE NOTES NEED TO BE DATED BEFORE THE MEDICATION IS SENT.
>
> REMEMBER THIS APPLIES TO MEDICARE D PATIENTS THAT HAVE ANYTHING BILLED TO ILLINOIS MEDICAID.
>
> THIS APPLIES TO PHARMACISTS AND TECHNICIANS.
>
> **ABSOLUTELY NO EXCEPTIONS!!!!!!!**
>
> THE SAME APPLIES FOR MEDICARE B.
>
> THIS ALSO INCLUDES ALL MENTAL HEALTH PATIENTS IN GROUP HOMES OR CILA'S. THE NOTE SHOULD READ THAT "RN/CASE WORKER/PATIENT REQUESTED REFILL OF ……….
>
> I have looked at some order[s] that were billed to Illinois Medicaid in the last month and those notes are not in disclosures. A DISCLOSURE NOTE MUST BE ENTERED FOR <u>EVERY</u> DELIVERY.

*Id.* Kulekowskis referred to the meeting as a "CYOA (Cover Your Own Ass) Meeting." *Id.* ¶ 63. Castillo-Baier, along with all C&M pharmacists and technicians, attended the CYOA meeting. *Id.*

At the November 14 meeting, Kulekowskis presided and told the room that he "want[ed] everybody on the same page" regarding the subpoena and wanted to make sure "they were all saying the same thing if questioned." *Id.* ¶ 64. Kulekowskis then

told the meeting participants to say "that they do not do any auto-refills, but do call all patients to remind them when their prescriptions are about to run out and would need to be refilled." *Id*. ¶ 65. He added that the pharmacists and technicians must continue to enter the disclosure notes for each patient stating that he or she had requested a refill. *Id*. Further, Kulekowskis advised the group that in addition to computer disclosure notes, they should start making handwritten notes on the daily computer printouts showing all refills to be filled for a particular day. *Id*. ¶ 66.

### 5. "Patient A"

The Government offers "Patient A" as an example of a C&M customer and Illinois Medicaid patient not contacted monthly for refill authorization. *Id*. ¶ 77. Patient A remained a C&M customer from May 24, 2013 through October 19, 2014. *Id*. During this time, Patient A never called C&M to request medication refills, yet every 30 days C&M refilled Patient A's three medications. *Id*. ¶¶ 77−78.

For example, on July 21, 2014, C&M transmitted a refill claim for payment to Illinois Medicaid for Patient A's Atripla medication. *Id*. ¶ 80. According to the Government, on the transmission form C&M made a specific representation as to the "goods actually provided to Patient A." *Id*. Field "D2" on the form correctly indicates Patient A's Atripla prescription number. *Id*. Field "DF" then indicates that Patient A's physician authorized six refills on the original prescription. *Id*. Field "D3" indicates the actual fill number for a prescription. *Id*. For this July 21 transaction, a C&M employee allegedly typed "02" into the "D3" field, making a specific representation that this constituted the first refill on the original prescription. *Id*.

14

But C&M's telephone logs do not contain any record of phone contact with Patient A for this refill, and the disclosure note field in C&M's record for this transaction remained blank. *Id.* ¶ 81.

According to the Government, the State paid C&M $2,054.39 for this fraudulent claim. *Id.* ¶ 82. And in total, between May 24, 2013 and October 19, 2014, the State paid C&M $33,867.16 for claims submitted for Patient A's refills. *Id.*

### 6. The CORE Center

Dr. Ronald Lubelchek of the Ruth M. Rothstein CORE Center served as Patient A's physician. *Id.* ¶ 83. Cook County Health and Hospital Systems operates the CORE Center, which provides medical services for patients with HIV and other infectious diseases. *Id.* Approximately 75 percent of CORE Center patients comprise Illinois Medicaid recipients or participants in Medicaid Managed Care plans. *Id.* The CORE Center operates a pharmacy on premises; C&M serves as one of the outside pharmacies that provides medications for the on-premises pharmacy. *Id.* ¶ 84.

According to Dr. Lubelchek—who has worked with the CORE Center since 2005 and now serves as its acting medical director—C&M sends electronic authorization requests through a patient's electronic medical records after a patient exhausts the series of refills for that specific medication. *Id.* ¶¶ 85−86. C&M does not, however, contact the CORE Center every month to obtain authorization for each refill on a specific prescription. *Id.* ¶ 86. According to the Government, C&M nevertheless sends refills to the CORE Center on a monthly basis, which results in

15

some patients not collecting medications. *Id.* ¶ 87. According to Dr. Lubelchek, the CORE Center returns unclaimed medications to C&M. *Id.*

After May 1, 2013, C&M submitted 904 claims to Illinois Medicaid based upon refills for which Dr. Lubelchek served as the provider. *Id.* ¶ 88. The State paid C&M approximately $424,698.51 for such claims. *Id.* Moreover, the CORE Center kept a log from December 2013 through December 2015 detailing unclaimed medications filled by C&M that they ultimately returned. *Id.* ¶ 89. According to CORE Center Staff, of the various pharmacies the Center used, only C&M accepted return medications; the Center destroyed unclaimed medications from other pharmacies. *Id.* The Government alleges that C&M never reversed and credited the State for these returned medications. *Id.* ¶ 90.

### 7. Post-Investigation Claims

The Government notes that once Walgreens Corporate became involved with the investigation at issue in this case, C&M's Medicaid sales—both for original and refilled prescriptions—declined "precipitously." *Id.* ¶ 91. For comparison, between May 1, 2013 through December 31, 2014, C&M submitted 85,933 claims to Illinois Medicaid and received $30,460,303.12 back in payment. *Id.* Of those claims, 54,354 were refills totaling $21,786.314.11. *Id.* And from January 1, 2015 through December 31, 2015, following Walgreens' involvement in the investigation, C&M submitted 39,093 total claims to Illinois Medicaid, amounting to $12,448,113.13. *Id.* Of those claims, only 18,902 amounted to refills totaling $8,209,445.55 in Medicaid reimbursement. *Id.*

### F.     Copayment Allegations

According to Relators, between August 2009 and October 24, 2016, Walgreens and Kulekowskis routinely and systematically waived copayments for Medicare and Medicaid patients to induce them to fill their prescriptions at C&M.  [65] ¶ 73. Relators allege that the practice of waiving copayments, along with the use of auto-refills, relates to the broader goal of inducing patients to use the C&M location, as the two practices together allowed patients to receive prescriptions month after month at no cost.  *Id.* ¶¶ 186–91, 197.

The Handbook provides, in relevant part, that "participants are responsible for paying the costs involved in obtaining pharmacy services."  *Id.* ¶ 42.  All providers who perform services that require recipient copayment must make a reasonable attempt to collect that copayment from the participant.  *Id*.  The Handbook states when billing the Department, providers should bill their usual and customary charge but should not report the participant's co-payment or coinsurance on the claim, as the Department will automatically deduct it.  *Id*.

### 1.     Castillo-Baier's Billing Experience

According to Castillo-Baier, she first became aware of Defendants' copayment waiver practice shortly after transferring to the C&M location in May 2013.  *Id.* ¶ 81. Around this time, she filled multiple prescriptions for a Core Center HIV patient, one of which was Hydrocodone—a painkiller not covered by Medicaid for the patient that month because of Illinois Medicaid's 30-day, four-prescription limit.  *Id.* ¶ 82.  Based upon her experience as a retail pharmacy technician and her C&M training, Castillo-

Baier understood that the patient needed to pre-pay for the non-covered prescription. *Id.* ¶ 83. In addition, C&M staff trained Castillo-Baier that if a patient held an outstanding balance of $150 or more, she should refer the issue to the finance department and/or call the patient. *Id.* ¶ 83. Based upon this training, she checked the patient's record and saw that the patient held an outstanding balance for copayments. *Id.* ¶¶ 83−84.

Castillo-Baier then called the patient to relay that Medicaid would not cover the Hydrocodone prescription, and that the patient needed to pay the current balance due for copayments before any prescriptions would ship. *Id.* ¶ 85. The patient then became upset, yelling at Castillo-Baier and saying that she never received bills from C&M and could not be charged for a bill she never received. *Id.* ¶ 86. Following this call, the patient called the head of the HIV department at C&M, Linette Pho, to complain about having to pay the balance due for copayments before receiving the prescriptions, as she had never received a bill. *Id.* ¶¶ 87, 109. Pho told Kulekowskis about this call; Kulekowskis subsequently came to Castillo-Baier's desk and said "Do not deny my public aid patients. If they are pubic aid they do not pay." *Id.* ¶ 87. Castillo-Baier responded by telling Kulekowskis that C&M "w[as] required to collect copayments," but Kulekowskis responded that Castillo-Baier could not "come in here and change things" at C&M. *Id.* ¶ 89. Throughout her employment, Castillo-Baier also repeatedly heard Pho tell Core Center patients over the phone that they would not receive a bill for copayments, and that there would be "no charge for your medication." *Id.* ¶ 92.

### 2.    C&M's Billing Structure

When Walgreens transferred Castillo-Baier to C&M's finance department in January 2014, she learned that C&M maintained approximately 15 billing groups into which it placed patients. *Id.* ¶ 94. In her new role, Castillo-Baier maintained responsibility for default billing and placing patients into the proper billing groups. *Id.* ¶¶ 94, 108−116. Some of the billing groups related to specific facilities, such as mental health facilities, while C&M based others upon a combination of factors, including the insurance a particular patient had. *Id.* ¶ 95. These latter groups included:

- Monthly – Patients on private health insurance;

- Dual Eligible – Patients on both Medicare and Medicaid;

- ILMED (Medicaid) – Patients on Illinois Medicaid, including Managed Care Medicaid plans;

- Medicare – Patients on Medicare;

- Core Center of Chicago – DO NOT SEND – Patients of the Core Center covered in any way by Illinois Medicaid; and

- General DO NOT SEND – Patients who notified Defendants that they could not pay a particular bill.

*Id.*

C&M sent patients in the Monthly, Dual Eligible, ILMED, and Medicare billing groups invoices every month for outstanding balances, including copayments. *Id.* ¶ 96. According to Relators, C&M did not, however, bill patients in both the Core Center of Chicago – Do Not Send and General Do Not Send billing groups for copayments for covered prescriptions, instead writing them off as "bad debt" after 90

days. *Id*. ¶¶ 74, 97, 101. Castillo-Baier alleges that Kulekowskis told the Core Center that if it referred patients to C&M, it would write off all copayments for those patients. *Id*. ¶ 78.

Once C&M placed a patient in the Core Center – Do Not Send billing group, it never re-evaluated or moved that patient to another billing group, even if his or her insurance coverage changed. *Id*. ¶ 99. And once a patient fell into the General Do Not Send billing group, C&M never sent an invoice or made any efforts to collect copayments. *Id*. ¶¶ 101, 179.

The individuals who trained Castillo-Baier when she transferred to the C&M finance department, Ronnie Mok and Tina Northrup, told Castillo-Baier that they placed Core Center Medicaid patients in the separate Core Center Do Not Send billing group, did not send them invoices, and wrote off their copayments based upon instructions from Kulekowskis. *Id*. ¶¶ 103. According to Northrup, such practices constituted typical procedure for as long as she could remember once Kulekowskis became the store manager in August 2009. *Id*.¶ 104. And at some point in early 2014, Kulekowskis told Castillo-Baier that Defendants had "a deal" with Core Center, and as a result Defendants did not bill their patients. *Id*. ¶ 105.

According to Castillo-Baier, around February 2014 she sent a billing statement to a Core Center patient who, for an unknown reason, was not placed in the Core Center – Do Not Send billing group. *Id*. ¶ 121. When that patient later called to complain about receiving the bill, Kulekowskis reminded Castillo-Baier that "Core Center patients were not to be billed for their copayments." *Id*. ¶¶ 119, 121. On other

occasions when Core Center patients placed into the wrong billing group called Castillo-Baier to complain about receiving bills, the patients told Castillo-Baier that their doctor told them they would not receive bills for copayments.  *Id*. ¶¶ 123−24, 155.

Relators allege that as part of C&M's process for writing off previously waived copayments, Castillo-Baier, Hayes, Mok, and Northrup participated in monthly finance meetings led by Kulekowskis.  *Id*. ¶ 128.  For these meetings, Kulekowskis directed Mok to run monthly reports "showing revenues and patient responsibilities (including copayments) for the two Do Not Send billing groups and the ILMED billing group."  *Id*.  Once Kulekowskis reviewed these reports, C&M wrote off any outstanding balances more than 90 days overdue for patients in these three billing programs as "bad debt."  *Id*. ¶ 129.  The finance department, including Castillo-Baier, implemented these bad debt write-offs.  *Id*. ¶ 130.  After Walgreens transferred Kulekowskis to another location around July 2015, the C&M finance department stopped its practice of writing off copayments as "bad debt."  *Id*. ¶ 132.  It did, however, continue to waive copayments for the two Do Not Send billing groups; the department maintained the outstanding balances on C&M's books without writing them off.  *Id*.

### 3.    **Free Pharmacy Consultations**

In addition to waiving copayments, Relators allege that C&M provided free, specialized pharmacist consultations to Core Center patients and providers.  *Id*. ¶ 145.  Specifically, once per month, Pho—a certified HIV Pharmacist with specialized

21

training—traveled to Chicago to provide pharmacist consultations to Core Center patients, doctors, and/or nurses for free, when such a consultation would normally cost several hundred dollars. *Id.* ¶¶ 146−52.

### 4. C&M's Compliance Efforts

In 2015, Rick Desecki became the new C&M store manager. Shortly thereafter, a Core Center physician pulled a patient from C&M after Desecki instructed Pho to bill the patient for a copayment. *Id.* ¶¶ 162−63. In response, Castillo-Baier overheard Pho complain to C&M staff that because C&M had written off Core Center copayments for so long, it could not "just one day stop" those practices. *Id.* ¶ 164. According to Relators, it took Walgreens until October 24, 2016 to fully change its overall practices regarding the Do Not Send billing groups; on that date, C&M switched from the CarePoint software system to Intercom Plus—the same software used by Walgreens locations nationwide. *Id.* ¶ 166.

In the Intercom Plus software, C&M staff entered a medication through the point of sale (POS) register, which required a record of some form of payment before filling a prescription. *Id.* ¶ 209. If the patient did not have a credit card or express payment information on file, a technician would have to input a billing code created by Walgreens' corporate office—known as PATCOB—so that the corporate office knew to send the patient a bill. *Id.* ¶ 210. All patients used PATCOB regardless of whether the patient had private insurance or fell under Medicaid or Medicare coverage; technicians could no longer categorize patients into separate billing groups, including the Do Not Send billing groups. *Id.* ¶¶ 211−12. As a result, Core Center

patients and physicians, as well as non-Core Center patients, called to complain about receiving bills. *Id.* ¶¶ 213−14. Often, Core Center physicians requested that Pho transfer their patients' medications to other pharmacies. *Id.* ¶ 215.

According to Relators, from May 1, 2013 through December 31, 2014, C&M submitted 85,933 claims to Illinois Medicaid and received $30,460,303.12 thereon. *Id.* ¶ 218. From January 1, 2015 through December 31, 2016, C&M submitted only 39,093 total claims to Illinois Medicaid, totaling $12,448,113.13. *Id.* Relators allege that this nearly 60 percent decrease resulted from the change in copayment waiver practices. *Id.*

## II. Legal Standard

### A. Motion to Dismiss Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so Defendants have "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory

23

statements, do not suffice." *Limestone Dev. Corp. v. Vill. of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating the complaints, this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the Government and Relators' favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). On a motion to dismiss, this Court may consider the complaint itself, documents attached to the complaint, documents central to the complaint and to which the complaint refers, and information properly subject to judicial notice. *Williamson*, 714 F.3d at 436.

## B. Rule 9(b) Standard

Because the FCA serves as an anti-fraud statute, "claims under it are subject to the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure." *United States ex rel. Gross. v. AIDS Research All.-Chi.*, 415 F.3d 601, 604 (7th Cir. 2005). Rule 9(b) requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated "with particularity." In adding "flesh to the bones of the word particularity," the Seventh Circuit has "often incanted that a plaintiff ordinarily must describe the who, what, when, where, and how of the fraud—the first paragraph of any newspaper story." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011) (internal quotations omitted). Ultimately, a plaintiff must inject "precision and some measure of substantiation" into fraud allegations. *United States and Wisc. ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016)

(*Presser*) (internal quotations omitted).

Rule 9(b)'s heightened pleading requirements serve three main purposes: (1) protecting a defendant's reputation from harm, (2) minimizing "strike suits" and "fishing expeditions," and (3) providing notice of the claim to the adverse party. *Id*. Fair notice requires a plaintiff who pleads fraud to "'reasonably notify the defendants of their purported role in the scheme.'" *Id*. at 778 (quoting *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1020 (7th Cir. 1992)); *see also Guar. Co. of N. Am. v. Moecherville Water Dist., N.F.P.*, No. 06-cv-6040, 2007 WL 2225834, at *2 (N.D. Ill. July 26, 2007) ("The purpose of the more restrictive pleading standard is to ensure that the accused party is given adequate notice of the specific activity that the plaintiff claims constituted the fraud, so that the accused party may file an effective responsive pleading.").

## III. Analysis

### A. The Parties' Claims

Relators and the Government proceed based upon two largely different theories of FCA liability. While Relators' SAC includes some allegations related to automatic refills, [65] ¶¶ 183−97, they base their claims primarily upon allegations that Defendants Walgreens and Kulekowskis routinely and systematically waived copayments for Medicaid and Medicare patients, *id*. ¶ 3.

The Government, on the other hand, does not bring any allegations related to copayment waivers. *See generally* [64]. Instead, the Government's JCI alleges that Defendants Walgreens, Kulekowskis, and Hayes automatically refilled prescriptions

for Illinois Medicaid patients serviced at C&M. *Id.* ¶¶ 1, 3. The Government also brings claims for common law fraud, unjust enrichment, and payment by mistake (only against Defendant Walgreens) based upon its automatic refill allegations. *Id.* ¶¶ 104–11.

### B. FCA & IFCA Standard

To state a claim under the FCA, Relators and the Government both must show that Defendants "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(1)(A), or "knowingly ma[de], use[d], or cause[d] to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). Relators and the Government each bring their respective theories of liability under both Sections 3729(a)(1)(A) and (a)(1)(B) and their respective IFCA counterparts, 740 ILCS §§ 175/3(a)(1)(A)–(B). [64] ¶¶ 92–103; [65] ¶¶ 223–259.

A "claim" under the FCA "includes direct requests to the Government for payment as well as reimbursement requests made to the recipients of federal funds under federal benefits programs." *Universal Health Servs., Inc. v. U.S. ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016) (*Escobar II*) (citing 21 U.S.C. § 3729(b)(2)(a)). In the case here, parties can bring FCA claims under two theories of falsity: express false certification and implied false certification—"in essence, falsity resulting from express misrepresentations or from misrepresentation by omission." *United States ex rel. Lisitza v. Par Pharm. Cos.*, 276 F. Supp. 3d 779, 789 (N.D. Ill. 2017) (*Lisitza*).

As discussed below, the parties base their FCA claims upon implied false certification theories.

The FCA's scienter and materiality requirements are "rigorous." *Escobar II*, 136 S. Ct. at 2002. Per the statutory definitions here, "knowingly" means "that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information . . . ." 31 U.S.C. § 3729(b)(1); *see also United States ex rel. Sheet Metal Workers Int'l Ass'n v. Horning Invs., LLC*, 828 F.3d 587, 593 (7th Cir. 2016). The knowledge requirement does not, however, require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). The term "material" means "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." *Id*. § 3729(b)(4). Moreover, a "misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be material to the Government's payment decision in order to be actionable under the False Claims Act." *Escobar II*, 136 S. Ct. at 1996.

Courts evaluate IFCA claims under the same standards as those applicable to FCA claims. *United States ex rel. Grenadyor v. Ukrainian Vill. Pharmacy, Inc.*, 772 F.3d 1102, 1109 (7th Cir. 2014); *Cunliffe v. Wright*, 51 F. Supp. 3d 721, 740 (N.D. Ill. 2014). Thus, this Court will apply its FCA analysis to Counts I through IV of both the Government's JCI [64] and the Relators' SAC [65]. This Court turns first to the Government's FCA theory of liability.

### C.    JCI Counts I through IV: The Government's FCA Theory

The Government's FCA theory contains two separate theories of FCA liability. First, the Government alleges that Defendants Kulekowskis and Hayes executed a scheme to "willfully disregard [Illinois'] auto-refill prohibition and to conceal their deception in order to obtain funds from the State." [74] at 1. Second, it alleges that C&M engaged in a related scheme by: (1) billing the State of Illinois for auto-refilled prescriptions that ultimately went unclaimed by patients; and (2) and failing to then reverse and credit the State for these unclaimed prescriptions. [64] ¶¶ 87–90. This Court turns first to the initial auto-refill theory.

### 1.    The Auto-Refill Claims Are Not Implicitly False

Defendants move to dismiss the Government's auto-refill claim pursuant to Rule 9(b)'s particularity requirement, arguing that the Government: (1) fails to plead the submission of a false claim with particularity; (2) relies upon impermissible group pleading; and (2) fails to allege Defendant Walgreens' scienter. [69] at 8–14. This Court agrees with Defendants, and dismisses Counts I through IV of the JCI because the Government: (1) fails to plead any specific representation relating to the auto-refill prohibition on the face of C&M's claims for reimbursement; (2) fails to allege omitted information that renders the description of any refilled drugs misleading; and (3) fails to describe in sufficient detail the allegedly fraudulent auto-refill practices.

As an initial matter, the Government does not clarify whether it brings its FCA claim under an express or implied false certification theory. *See generally* [74].

Under an express false certification theory, a plaintiff must allege that defendants "falsely and specifically certified that it is in compliance with regulations which are prerequisites to Government payment in connection with the claim for payment of federal funds." *United States ex rel. Grey v. UnitedHealthcare Ins. Co.*, No. 15-cv-7137, 2018 WL 2933674, at *4 (N.D. Ill. June 12, 2018) (quoting *United States ex rel. Cieszyski v. LifeWatch Servs.*, No. 13 CV 4052, 2015 WL 6153937, at *6 (N.D. Ill. Oct. 19, 2015)). An implied false certification theory, on the other hand, applies when "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements," and then those "omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services provided." *Escobar II*, 136 S. Ct. at 1999. Although the Government fails to specify under which theory its auto-refill allegations fall, this Court finds *Lisitza* instructive on this point.

In *Lisitza*, the plaintiffs alleged that defendant Par Pharmaceutical Companies, Inc., caused national pharmacy chains to submit false claims for reimbursement from Medicaid. 276 F. Supp. 3d at 781. The plaintiffs alleged that Par induced pharmacies to fill prescriptions not with the generic drugs providers originally prescribed, but with more expensive forms and dosages of those drugs manufactured by Par. *Id.* at 781. As such, Par caused the pharmacies to submit claims that were facially truthful with respect to the goods provided and their cost, but misleading because the pharmacies omitted that they substituted forms and

dosages of the medications to maximize their profit, in violation of Medicaid regulations. *Id.* at 782, 793–94.

In deciding that Par's allegations fell under the implied false certification theory, the *Lisitza* court reasoned:

> The fraudulent, or false, nature of the claims results from the omission of information that is allegedly necessary to make the statement set forth on the claim (essentially, 'PHARMACY paid $X for Drug Y which was dispensed to Customer Z on DATE") not misleading. That claim is therefore 'fraudulent' only by its alleged implication that it was proper under the Medicaid regulations to dispense Drug Y to Patient Z. The falsity, if any, lies only in the omission of information that would render the representations about the dispensed drugs (the 'goods or services provided') misleading.

*Id.* at 794. Because the alleged omission implied falsity, the court found that the Supreme Court's decision in *Escobar II* (which provided the framework for the implied certification framework) governed the case. *Id.*

Here, as in *Lisitza*, the Government does not allege that C&M's claims constituted facially untruthful statements as to the type of drugs provided or their true costs. Rather, it alleges that C&M omitted that it did not seek or receive authorization for certain prescriptions from the claims, and thus violated Illinois' auto-refill prohibition. *See, e.g.*, [64] ¶ 3 ("Defendants have knowingly and willfully submitted false claims for reimbursement for such automatically refilled prescriptions . . . by falsely and fraudulently indicating in the patient's profile that either the patient . . . or a provider requested the refill"); [74] at 4 ("Defendants then submitted claims for the prescriptions to Illinois Medicaid for each of the improperly auto-refilled prescriptions."). Any falsity thus stems from the "alleged implication

30

that it was proper under the Medicaid regulations to dispense" the drugs to C&M's patients under the true circumstances. *Lisitza*, 276 F.3d at 794. Accordingly, this Court proceeds to analyze the Government's auto-refill allegations under the implied false certification theory.

An FCA theory based upon implied false certification must meet two conditions: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *United States ex rel. Nelson v. Sanford-Brown, Ltd.*, 840 F.3d 445, 447 (7th Cir. 2016) (*Sanford-Brown II*) (citing *Escobar II*, 136 S. Ct. at 2001).

In satisfying the first prong, the Government needs to show a specific misrepresentation on a claim's face or otherwise identify omitted information that renders the *description* of a good or product misleading. *Lisitza*, 276 F. Supp. 3d at 798; *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993) ("Omissions are actionable as implied representations when the circumstances are such that a failure to communicate a fact induces a belief in its opposite.").

Thus, in applying the implied false certification framework, this Court must first ask what specific representations, if any, C&M made about the medications for which it submitted claims for reimbursement. *Lisitza*, 276 F. Supp. 3d at 795 (citing *Escobar II*, 136 S. Ct. at 2000).

In *Escobar II*, for example, the facility represented by way of National Provider

Identification numbers (included on claims submitted for reimbursement) that qualified practitioners had provided the relevant medical services, when in fact they lacked the requisite credentials and licensing. 136 S. Ct. at 1997. Therefore, the claims made specific misrepresentations about the goods and services provided, because they used the codes corresponding to the service and the provider "without disclosing [the] many violations of basic staff and licensing requirements." *Id*. at 2000−01.

Here, unlike *Escobar II*, the Government fails to identify any "specific representation" that rendered a given claim a "misleading half-truth by the omission of material facts." *Lisitza*, 276 F.3d at 796. Rather, the Government's only example of *any* claim representation relies upon "Illinois Medicaid Patient A." [64] ¶ 77. According to Patient A, C&M kept him on automatic refill; Patient A never called C&M to request medication refills, and every 30 days C&M refilled Patient A's three medications automatically. *Id*. ¶¶ 77−78. The Government points to a single refill claim for payment from Patient A—garnered from C&M's Illinois Medicaid records— that C&M submitted for Patient A's Atripla medication. *Id*. ¶ 80; [64-1]. According to the Government, Field "DF" on the form indicates that Patient A's physician authorized six refills on the original prescription, while Field "D3" on the form indicates the actual fill number for a prescription. *Id*. For this claim, an unknown C&M employee typed "02" into the "D3" field, indicating it served as the first refill. *Id*. Because C&M's telephone logs do not contain any record of phone contact with Patient A for this refill, and C&M's electronic disclosure notes for this transaction

32

remain blank, the Government contends that the "D3" entry made a specific, false representation "that this was the first refill on the original prescription." *Id.* ¶¶ 80−81. Not so.

Patient A's transmission form, [64-1]—the Government's only allegation of a claim form submitted by C&M—lacks "any affirmation or statement that the claimant has complied with all applicable laws and regulations."[3] *Lisitza*, 276 F.3d at 798. The form contains no space for disclosing whether the employee filling out the form made contact with Patient A's physician, provider, or any other relevant individual. [64-1]. Rather, the form indicates only that it served as the first refill on the original prescription, which remains a true, facially accurate statement. *Id.* (Field "D3"); [64] ¶ 80. In other words, the Government does not allege that Field "D3" constitutes a false representation because C&M never refilled the prescription, but because it refilled the prescription in a manner unauthorized by the auto-refill regulations in the first place. *Id.* ¶¶ 3, 79.

But this allegation—that Field "D3" serves as a specific misrepresentation because C&M violated Medicaid regulations by fulfilling the prescription in the first

---

[3] The Government notes, correctly, that to enroll in Illinois Medicaid, C&M certified that it would follow all applicable laws and regulations. [64] ¶¶ 26, 28. Moreover, once enrolled, C&M signed the Illinois Medicaid Provider Agreement, which provides, in part, that providers of prescription drugs will comply with all current and future program policy and billing provisions. *Id.* ¶¶ 27, 28. But neither the enrollment paperwork nor the Provider Agreement constitute a claim for payment; rather, the Government alleges that the reimbursement forms themselves contain the false representations at issue. *Id.* ¶ 3. Absent any allegation that at the time of enrollment, C&M certified it would comply with applicable laws and regulations despite having no intention to do so (i.e. a fraudulent inducement theory), the Government's FCA claim cannot rest upon representations made in the enrollment form or provider agreement. *See Lisitza*, 276 F. Supp. 3d at 811 n.8 ("But if the defendant intended to comply at the time of enrollment, but later did not, it has not committed fraud; it has breached a contract.") (citing *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005)).

place—cannot withstand scrutiny.  The Seventh Circuit has made clear that "it is not enough to . . . prove that the pharmacy engaged in a practice that violated a federal regulation" because "[v]iolating a federal regulation is not synonymous with filing a false claim."  *Grenadyor*, 772 F.3d at 1102; *see also Lisitza*, 276 F.3d at 796−97 (finding no specific representation where the plaintiffs were "primary concerned with [ ] whether it was permissible to dispense the subject drugs at all, not with whether there was a false representation about the drugs, their cost, or the quantity dispensed."); *United States ex rel. Crews v. NCS Healthcare of Illinois, Inc.*, 460 F.3d 853, 858 (7th Cir. 2006) (where defendant allegedly violated pill storage and handling regulations, and in the process re-dispensed and double billed for returned drugs, the regulatory violations did not render reimbursement claims false, because a reimbursement claim could "not turn into a false claim under the FCA just because [defendant] stored or handled the drugs improperly.").  As such, the Government fails to offer any specific representation on Patient A's claim relating to the auto-refill allegations.

Accordingly, absent a specific misrepresentation on the face of a claim, the Government must identify omitted information that renders the *description* of a given prescription misleading.  *Lisitza*, 276 F.3d at 798.  According to the JCI, C&M omitted material information by submitting claims for refills despite never seeking authorization to do so.  [64] ¶ 82.  Again, it offers Patient A as the only example of a specific claim.  *Id.* ¶ 77−82.

According to the Seventh Circuit, "[o]missions are actionable as implied representations when the circumstances are such that a failure to communicate a fact induces a belief in its opposite." *Midwest Commerce Banking Co. v. Elkhart City Ctr.*, 4 F.3d 521, 524 (7th Cir. 1993). But here, Patient A's transmission form provides no basis to infer that C&M necessarily sought authorization for each refill it issued. Rather, as the Government concedes in its response memorandum, pharmacies do not always have to seek authorization before refilling a prescription. [74] at 7–8.

For example, Section P-208.4 of the Handbook, which the Government references in its JCI, [64] ¶ 36 n.1, identifies an exception to the auto-refill prohibition.[4] Specifically, it states that the policy "does not apply to medications that are dispensed to residents of LTC [Long Term Care] facilities or community based living arrangements such as CILA [Community Integrated Living Arrangement], SLF [Supportive Living Facility] or sheltered care facilities." Thus, the Handbook, by its own terms, did not even require authorization from the patient or provider under every circumstance. *See, e.g.*, *Lisitza*, 276 F. Supp. 3d at 799 (explaining that "the claims at issue provide no basis to infer that the drug dispensed was the drug originally prescribed" because "given the plethora of state laws and regulations that govern the dispensing of prescription medication, there may be many reasons why the drug actually dispensed may differ from the drug originally prescribed.").

---

[4] The 2013 version of the handbook referenced in the Government's JCI remains available at: https://web.archive.org/web/20141223154619/https://www.illinois.gov/hfs/SiteCollectionDocuments/p 200.pdf.

For this reason, this Court cannot read Patient A's transmission form to include an "affirmation" that C&M sought and received authorization for the specific refill. Indeed, where on Patient A's form would C&M have self-reported such information? *See generally* [64-1]; *see, e.g.*, *id.* ("If pharmacies were required to identify whether the drug dispensed was the drug originally prescribed, one would expect that the Medicaid agencies would require them to say so on their reimbursement forms. But they don't.") (citing *Thulin v. Shopko Stores Operating Co., LLC*, 771 F.3d 994, 1000 (7th Cir. 2014) (rejecting FCA claims based upon reimbursement forms that did not require information about whether the patient was subject to a dual-copay, as the absence of a request for the relevant data on the claim form was "compelling evidence" that defendants "did not have an obligation to submit co-pay information to Medicaid.")).

The Government responds that: (1) the FCA does not require it to address any exceptions to the auto-refill prohibition, as they constitute "defenses, not affirmative requirements"; and (2) it nonetheless complied with Rule 9(b) by "furnish[ing] . . . the detailed scheme of C&M and its manager defendants to willfully circumvent the auto-refill violation" and by "illustrat[ing] it with an actual C&M claim submitted to and paid by the State of Illinois." [74] at 7, 8. This Court disagrees.

With respect to the first point, the Government provides no authority for its assertion that the sub-regulatory guidance upon which it bases its entire FCA theory constitutes a "defense" that it need not address in its complaint. *See generally* [74]. Moreover, it misses the point: even if Patient A's medication *did* require

authorization—an allegation not made in the JCI—a claim form for a patient who did not require authorization, such as an LTC patient, would look identical to that of Patient A. Accordingly, Patient A's form fails to contain the requisite "affirmation" that C&M sought and received authorization for the refill. *Lisitza*, 276 F. Supp. 3d at 799.

Relatedly, the Government's second point reveals another problematic aspect of its FCA theory: it bases its entire claim upon the underlying auto-refill regulatory violations, and argues that the corresponding bills must, by extension, constitute false claims. [74] at 8. In other words, the Government argues that even if the claim forms did not contain specific misrepresentations or misleading descriptions of the drugs, C&M still should have self-reported the underlying auto-refill violations on each claim form. Again, not so. Even taking the Government's auto-refill "scheme" as true, it demonstrates at most a compliance issue, not allegations of false claims for payment. *See Lisitza*, 276 F. Supp. 3d at 801; *see also United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325, 333 (9th Cir. 2017) (explaining that the FCA "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme.") (quoting *United States ex rel. Aflatooni v. Kitsap Phys. Serv.*, 314 F.3d 995, 1002 (9th Cir. 2002)).

Once again, the *Lisitza* court's reasoning remains instructive. Where the *Lisitza* plaintiffs alleged that the defendant induced pharmacies to fill prescriptions with forms and dosages of drugs more expensive than the generic drugs originally proscribed, the court found, in relevant part, that this underlying regulatory violation

could not render the claims themselves misleading:

> Undressed, the plaintiffs' argument is simply that the pharmacies never should have dispensed the subject drugs, and to the extent that they did, they were required to self-report regulatory violations so that Medicaid would not be misled into paying them.  That argument is precluded by the case law above holding that violating underlying regulations . . . is not the equivalent of filing a false claim.  Omitting information from the claim form about the course of events that led to the dispensing of a particular drug, or about its relative cost, does not go to the truth or falsity of the representations on the claim form itself, which . . . is limited to the claim for payment, at the government-set rate, for the actual drug dispensed.

276 F. Supp. 3d at 800−01.

Here, as in *Lisitza*, the Government alleges that C&M never should have dispensed Patient A's drugs, or any drugs, for that matter, without seeking authorization.  [64] ¶ 82.  But as noted above, any information about C&M's authorization efforts leading up to the issuance of a refill cannot undermine the veracity of the claim form itself.  Absent any allegation that C&M misled the Government about the drugs it provided or their cost, a claim for reimbursement alone, even if based upon an alleged "scheme," cannot sufficiently state an FCA claim. *See, e.g.*, *Sanford Brown II*, 840 F.3d at 447 (summary judgment finding that although relator alleged that defendant submitted claims certifying compliance with all applicable laws, when in fact it had violated provisions of Title IV of the Higher Education Act, there was no proof that defendant made any representations in connection with the claims for payment; instead, the defendants simply requested a disbursement). [5]

---

[5] To the extent Relators' SAC also includes FCA allegations related to the auto-refill scheme, [65] ¶¶ 183−97, this Court dismisses those allegations, without prejudice, for the same reasons it dismisses

### d.  The Government Fails to Plead the Auto-Refill Scheme with Sufficient Particularity

Finally, even if this Court accepts the Government's legal theory—that claims seeking reimbursement for drugs dispensed due to the alleged auto-refill scheme constitute false claims—their FCA claim nonetheless fails, as the Government fails to describe in sufficient detail the allegedly fraudulent auto-refill practices. *See Presser*, 836 F.3d at 778 ("Although a pleading need not exclude all possibility of honesty in order to give the particulars of fraud, the grounds for the plaintiff's suspicions must make the allegations *plausible*, even as courts remain sensitive to information asymmetries that may prevent a plaintiff from offering more detail.") (internal citations and quotations omitted).[6]

As discussed above, the Government points to a single refill claim for payment, garnered from C&M's Illinois Medicaid records, that C&M submitted for Patient A's Atripla medication. *Id*. at 80. But fatally, the Government fails to contextualize or otherwise demonstrate how this single data point plausibly indicates a broader auto-refill "scheme." [74] at 1. Rule 9(b)'s particularity requirement serves to "discourage a sue first, ask questions later philosophy." *Pirelli*, 631 F.3d at 441 (internal

---

the Government's auto-refill allegations. In fact, the SAC fails to allege that C&M submitted a single claim for an auto-refilled prescription. *Id*.

[6] In *Pirelli*, the Seventh Circuit explained that this "flexible" plausibility standard applies to plaintiffs alleging fraud based upon "information and belief." 631 F.3d at 442−43. But there, the court explained that pleading fraud based upon "information and belief" remains permissible only if "the facts constituting the fraud are not accessible to the plaintiff." *Id*. As this Court discusses below, Castillo-Baier worked in C&M's finance department doing billing work, [65] ¶¶ 17, 94; [73] at 3 n.1, and the Government possessed spreadsheets of records detailing "each C&M refill submitted to Illinois Medicaid." [64] ¶ 70. Thus, the following analysis demonstrates that even *with* accessible information, the Government fails to meet this flexible particularity standard.

quotations omitted). As such, to satisfy this requirement, plaintiffs must "conduct a careful pretrial investigation" to minimize the risk of extortion that may come from a baseless fraud claim. *Fidelity Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 748−49 (7th Cir. 2005). To be sure, a preliminary review of data can serve to satisfy this requirement. *Pirelli*, 631 F.3d at 446. But in doing so, the Government must place such data "in context." *Id.* at 444; *see also Presser*, 836 F.3d at 779 ("We previously have affirmed dismissals of complaints that fail to put the defendant's alleged [fraudulent] activity into its relevant context.").

In *Pirelli*, for example, the plaintiff brought suit against Walgreens, alleging that the pharmacy systematically filled prescriptions written for cheap forms of two popular drugs with more expensive alternatives. *Id.* at 438. As part of its complaint, the plaintiff presented a preliminary review of its own reimbursement data, which showed eleven instances in which it paid Walgreens for the more expensive forms when less expensive dosage forms were available. *Id.* at 439. In affirming the district court's dismissal, the Seventh Circuit found that the plaintiff failed to contextualize the reimbursement data, and thus the data could not plausibly support the fraud allegations. *Id.* at 444. Significantly, the data offered "no reason to think that reimbursements for a total of eleven members nationwide is suspicious," as it left the following contextual questions unanswered:

> [A]mong all the pharmacies with which [plaintiff] had dealings, did only Walgreens seek reimbursement for the more expensive form of Rantidine over this period? Are prescriptions for that form so exceedingly rare that the mere fact of reimbursement should raise eyebrows? [Plaintiff] has not pled or argued that the answer to these

questions is yes, and common sense says that the answer to each is likely to be no.

*Id.* at 444−45 (internal citation omitted).

Here, as in *Pirelli*, the JCI leaves too many crucial questions unanswered. For example, in light of the Handbook's exception to the auto-refill prohibition for residents of certain facilities, the Government fails to put Defendants' alleged activity into its relevant context. Are prescriptions written for residents of LTC, CILA, SLF, and sheltered care facilities sufficiently rare such that a refill without disclosure notes or a call log record "should raise eyebrows?" *Pirelli*, 631 F.3d at 444. Did Patient A reside at an excepted facility such that the exception would apply to the Atripla prescription? Did C&M properly contact with Patient A's provider or family member, rather than Patient A directly?[7] The Government has, by its own admission, reviewed spreadsheets of records detailing "each C&M refill submitted to Illinois Medicaid" from May 1, 2013 through December 31, 2016. [64] ¶ 70. Here, as in *Pirelli*, this Court sees no reason why the Government could not have gone beyond this single instance of a prescription to contextualize the data. 631 F.3d at 445 ("The bare fact of inconsistent reimbursements for three patients in a five-year time period is not sufficient to raise allegations of fraud above the speculative level.").

But rather than provide additional prescription examples that could help this Court place Patient A's refill in context, the Government instead provides conclusory descriptions of additional, non-contextualized data. For example, it states that

---

[7] Section 208.4 of the provider handbook states that all "prescription refills must be initiated by a request from the physician, recipient, or other person acting as an agent of the recipient, e.g., a family member."

C&M's records "reveal that claims submitted by C&M for HIV drug refills containing legitimate disclosure notes total only . . . 11% of the total HIV refills," while 1,831 claims for HIV drug refills "contained notes for HIV drug refills . . . that were generic in nature, as described in more detail above." [64] ¶¶ 71, 73. The Government fails, however, to explain the difference between "legitimate" versus "generic" entries. *See, e.g.*, *id*. ¶ 48 (offering "RN REQ. REFILLS" as an example of a "generic" and "vague" entry that was "false and fraudulent" without explanation).

Further, the Government alleges that 467 claims for unspecified medications contained notes that did not indicate whether employees obtained authorization for refills, and 17,803 claims for HIV refills contained no disclosure notes. *Id*. ¶ 72. But again, absent additional information as to the frequency with which C&M fulfilled prescriptions written for residents of LTC, CILA, SLF, and sheltered care facilities, the Government offers this Court no context with which to interpret whether notes lacking any mention of authorization should raise suspicion. In fact, common sense suggests that the instances of such claims might very well be high given HIV's chronic nature and the other "complex, genetic, rare, and chronic health conditions" for which C&M, as a specialty pharmacy, filled prescriptions. [64] ¶¶ 9, 31 (listing C&M's departments to include mental health, transplant, HIV, and biologics); *see also Pirelli*, 631 F.3d at 444−45 (finding plaintiff's data failed to plausibly support its fraud allegations because the plaintiff had "not pled or argued that the answer to [the court's unanswered] questions is yes, and common sense says that the answer to each is likely to be no.") (internal citation omitted).

42

Perhaps most problematically, the Government's data relies almost exclusively upon the lack of disclosure notes for given refills, *see, e.g.*, [64] ¶¶ 3, 50, 71, 74, 81, yet it fails to clarify whether pharmacies consistently document contact regarding refills in disclosure notes, nor does it cite to any law, regulation, or official Walgreens policy requiring pharmacists or technicians to include this information in disclosure notes. Without such information, this data suggests, at most, that C&M failed to satisfy its own internal policy of including disclosure notes. *See, e.g.*, *Presser*, 836 F.3d at 780 (affirming district court's dismissal of FCA claims for lack of particularity where relator failed "to demonstrate how defendant's policies compare[d] to other clinics or could otherwise be understood as 'unusual.'"). Absent additional information, "the data, untethered as they are, cannot corroborate a fraud because their free-floating nature stymies any meaningful understanding of what the numbers mean." *Id*. at 445.

To be sure, data does not provide the only method by which the Government can plead its auto-refill theory. The Seventh Circuit has held that relators can provide "firsthand facts *or* data to make [their] suspicions plausible." *Pirelli*, 631 F.3d at 445 (internal quotations omitted) (emphasis added). Here, however, the Government's firsthand facts cannot withstand scrutiny.

As an initial matter, many of the Government's allegations lack multiple elements of particularity required by Rule 9(b). Take, for example, the Government's assertion that at "Defendants' instruction, where the patient or provider had not specifically requested a refill for a Medicaid-covered prescription, a false and

fraudulent notation was made in connection with each prescription that the patient or a nurse called to request the refill." [64] ¶ 43. This statement—typical of many allegations in the JCI, *see, e.g.*, [64] ¶¶ 3, 6, 40, 48, 51, 55—lacks any specificity as to who made such instructions, when the notations were made, or to whom the instructions were made. *See, e.g.*, *Suburban Buick, Inc. v. Gargo*, No. 08 C 0370, 2017 WL 2653070, at *9−10 (N.D. Ill. May 29, 2009) (To comply with Rule 9(b), a complaint involving multiple defendants "should inform each defendant of the nature of his alleged participation in the fraud.") (citing *Vicom, Inc. v. Harbridge Merchant Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994)); *Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102, 1108 (7th Cir. 2014) (finding allegations insufficient because "there is nothing to indicate when [manager] directed that the charges not be reversed, whether [relator] was present, and if not, how [the relator] learned that the charges were never reversed."); *see also United States ex rel. Berkowitz v. Automation Aids, Inc.*, 896 F.3d 834, 841 (7th Cir. 2018) ("Though *Universal Health* clarified the circumstances under which a plaintiff may proceed on an implied false certification claim, its analysis does not change the fact that a plaintiff must sufficiently plead the essential elements of an FCA claim.") (citing *Escobar II*, 136 S. Ct. 1989).

In response to Defendants' particularity arguments, the Government's response memorandum lists seven specific paragraphs from its JCI which it argues state with particularity the "who, what, when, where, and how" of C&M's alleged FCA violations. [74] at 9−10. The relevant paragraphs allege as follows:

- According to Bundzinski, Defendants Kulekowskis and Hayes called meetings with all pharmacy technicians instructing them to always

44

document in C&M's computer system that the patient called C&M and requested the refill even if the patient had not done so. In reality, patients mainly called C&M when they had a complaint about delivery issues with their prescriptions. *Id.* ¶ 61.

- One of these meetings referred to by Bundzinski occurred on November 14, 2014. This meeting was triggered by a subpoena from the government received by C&M on November 10, 2014, requesting information regarding prescription refill practices since May 2013. *Id.* ¶ 62.

- Preceding this meeting, Defendant Hayes sent the following email on November 10, 2014, to all pharmacists and technicians . . . REMINDER: ALL MEDICAID PATIENTS MUST HAVE A DISCLOSURE NOTE EVERYTIME A MEDICATION IS DISPENSE[D] . . . . THE NOTES NEED TO BE DATED BEFORE THE MEDICATION IS SENT. *Id.* ¶ 62.

- Defendant Kulekowskis referred to the meeting as a "CYOA (Cover Your Own Ass) Meeting." *Id.* ¶ 63.

- Defendant Kulekowskis presided over the CYOA meeting and told everyone that he "want[ed] everybody on the same page" regarding the subpoena and wanted to make sure they were all saying the same thing if questioned. *Id.* ¶ 64.

- Defendant Kulekowskis then told the CYOA meeting participants to say that they do not do any auto-refills, but do call patients to remind them when their prescriptions are about to run out and would need to be refilled. He added that the pharmacists must continue to enter the false and fraudulent disclosure notes for each patient stating that the patient had requested the refill. *Id.* ¶ 65.

- Finally, Defendant Kulekowskis advised the pharmacists and technicians that in addition to the computer disclosure notes, they should start making handwritten notes on the daily computer printouts showing all refills to be filled for a particular day. Kulekowskis told the CYOA meeting attendees that there was no law saying how long they should keep the printouts, and so they should now start keeping the logs and making the notations to create a record of their "calls" with patients consenting to the refills. Effectively, Kulekowskis told the C&M employees to create a fake paper trail. *Id.* ¶ 66.

These allegations fail to provide sufficient particularity under Rule 9(b). The Government alleges that according to Bundzinski, Kulekowskis and Hayes called meetings to instruct employees to always document in C&M's computer system that the patient called C&M and requested the refill, even if the patient had not done so. [64] ¶ 61. The Government, however, fails to explain when any one of specific these meetings or instructions occurred. Instead, it references a single meeting that occurred after Bundzinski left C&M, allegedly triggered by the receipt of a subpoena on November 10, 2014. *Id*. ¶¶ 56, 62.

But the e-mail Hayes sent out prior to this meeting, as well as the alleged dialogue from the meeting, indicates only that in response to the subpoena, Kulekowskis and Hayes forcefully reminded employees to follow proper policies and procedures. At the parties' motion hearing, the Government's counsel referred to Hayes' e-mail as a "wink and a nod," implying it referred to fraudulent behavior. Yet the Government's own conclusory commentary provides the sole references to fraudulent behavior; for example, the Government alleges that Kulekowskis told the pharmacists and technicians to enter the "fraudulent" disclosure notes stating that each patient requested a refill, or that "[e]ffectively, Kulekowskis told the C&M employees to create a fake paper trail." *Id*. ¶¶ 65, 66. Simply put, this Court cannot accept such speculative and conclusory allegations as concrete support for the Government's alleged auto-refill "plot," [74] at 1. *See, e.g.*, *Presser*, 836 F.3d at 780 (dismissing allegations because relator's "subjective evaluation, standing alone, is not a sufficient basis for a fraud claim); *see also Twombly*, 550 U.S. at 555 (holding that

46

while "detailed factual allegations" are not required under Fed. R. Civ. P. 8(a)2, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

### 2.    The Government's Reverse & Credit Theory

In addition to its auto-refill theory, the Government also alleges that even though some "medications [at the Core Center] were never received by the intended patient and were returned to C&M, C&M never reversed and credited the State of Illinois for those returns." [64] ¶ 90. Specifically, the JCI alleges that between December 2013 and December 2015, "C&M submitted to the State of Illinois and was paid on 287 claims from CORE Center patients that were never collected and then returned to C&M but never reversed." *Id.*

But even if this Court accepts the premise of the reverse and credit theory—that C&M did fail to reverse and credit the State for medications returned to it—this portion of FCA still falls because the Government fails to plead any particular claim that resulted from this practice. *See, e.g., Kelly*, 846 F.3d at 333 (explaining that the FCA "focuses on the submission of a claim, and does not concern itself with whether or to what extent there exists a menacing underlying scheme.") (quoting *Aflatooni*, 314 F.3d at 1002); *United States Ex rel. Dolan v. Long Grove Manor, Inc.*, No. 10 C 368, 2014 WL 3583980, at *3 (N.D. Ill. July 18, 2014) ("Indeed, because the FCA does not create liability merely for a health care provider's disregard of Government regulations or improper internal practices . . . the *sine qua non* of a False Claims Act violation is the submission of a fraudulent claim.") (internal quotations omitted).

Here, the Government alleges that the Core Center returned any unclaimed medications to C&M, and then extrapolates, without explanation, that C&M submitted "287 claims from CORE Center patients that were never collected and then returned to C&M but never reversed." *Id*. ¶¶ 87, 89, 90. But the Government fails to indicate where it learned about these 287 claims, nor the specifics details of any one of them. *Id*.; *see also, e.g.*, *Berkowitz*, 896 F.3d at 841 (where relator alleged that he compiled reports showing defendants sold thousands of non-compliant products, allegation could not satisfy Rule 9(b) absent a description of the information used to compile the reports or explanation of what particular information any sales orders submitted by the defendants contained); *Presser*, 836 F.3d at 776 (plaintiffs must "use some . . . means of injecting precision and some measure of substantiation into their allegations of fraud.").

True, in *Presser*, the Seventh Circuit clarified that a plaintiff does not need to present, or even include allegations about, a specific document or bill that the defendants submitted to the Government." 836 F.3d at 777. But in that case, the court explained that because the relator worked as a nurse practitioner, "a position that does not appear to include regular access to medical bills," it did "not see how she would have been able to plead more facts pertaining to the billing process." *Id*. at 779 (citing *Corley v. Rosewood Care Ctr. Inc.*, 142 F. 3d 1041, 1051 (7th Cir. 1998) ("[T]he particularity requirement of Rule 9(b) must be relaxed where the plaintiff lacks access to all facts necessary to detail [her] claim.")); *see also United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854−55 (7th Cir. 2009) (where relator's

position as an engineer meant he knew about shipments and payments, but did not have access to billing paperwork, it was not necessary for relator to produce invoices at the "outset of the suit").

Here, in contrast, the Government has reviewed spreadsheets of records detailing "each C&M refill submitted to Illinois Medicaid." [64] ¶ 70. At the parties' motion hearing, it conceded that it did not require any additional discovery or investigation. Moreover, Relator Castillo-Baier worked in C&M's finance department doing billing work; the Government offers no explanation as to why she would not have had access to specific reverse and credit billing information in this role. [65] ¶¶ 17, 94.

In short, the Government cannot "describe a private scheme in detail" but then "allege simply and without any stated reason for [its] belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Dolan*, 2014 WL 3583980, at *3 (citing *United States ex rel. Clausen v. Laboratory Corp. of America, Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)). Instead, it must "link specific allegations of deceit to specific claims for payment." *Id.* (citing *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003)). Absent a single example of a specific claim for payment, the Government's reverse and credit allegations do not properly allege a FCA claim.

As stated above, the Government fails to: (1) plead any specific representation relating to the auto-refill prohibition on the face of C&M's claims for reimbursement; (2) allege omitted information that renders the description of any refilled drugs

misleading; and (3) describe in sufficient detail the allegedly fraudulent auto-refill practices. Indeed, the Government fails to provide a single example of a claim submitted in relation to its reverse and credit allegations. Accordingly, this Court grants Defendants' motion to dismiss the Government's FCA and IFCA claims—Counts I through IV of the JCI—without prejudice.

### D.    The Government's Remaining Claims

In addition to the FCA claims, Defendants also move to dismiss the Government's claims for common law fraud (Count V), unjust enrichment (Count VI), and payment by mistake (Count VII) (only against Defendant Walgreens) for failure to state a claim. [74] at 8, 14−15. For the reasons explained below, this court grants Defendants' motion.

### 1.    JCI Count V: Common Law Fraud

First, the Government's common law fraud claim, Count V, falls in conjunction with its FCA claims. To plead common law fraud under Illinois law, a plaintiff must allege: (1) a false statement of material fact; (2) known or believed to be false by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the truth of the statement; and (5) damage to the plaintiff resulting from such reliance. *Bonhomme v. St. James*, 970 N.E.2d 1, 10 (Ill. 2012) (citing *Doe v. Dilling*, 888 N.E.2d 24, 35−36. (Ill. 2008)). Here, the Government's common law fraud claim fails because it cannot identify a single false statement, much less one of material fact.

50

The JCI fails to allege the purported false and material statements made in connection with its common law fraud claim. [64] ¶¶ 104−106. Thus, this Court must assume that the Government bases its common law fraud claim upon the same representations underlying its FCA claim. *See Lisitza*, 276 F. Supp. 3d at 811. And as discussed above, the Government fails to identify: (1) a specific representation relating to the auto-refill prohibition on the face of C&M's claims for reimbursement; or (2) omitted information that renders the claims' description of any refilled drugs misleading. Nor does it allege any specific statement made in relation to the reverse and credit theory of falsity. Absent any identifiable false statement, this Court dismisses Count V of the JCI without prejudice. *See id.* at 810 (granting summary judgment as to common law fraud claims where plaintiffs based their FCA claims upon same representations as their common law fraud claim, and FCA claims failed due to absence of false statement or misleading representation).

### 2. JCI Count VI & VII: Unjust Enrichment and Payment By Mistake

The Government's remaining claims sound in Illinois state-law. The "general rule is that, when all federal-law claims are dismissed before trial," the pendent claims should be left to the state courts. When determining how best to exercise its discretion regarding the application of this general rule, this Court considers "the nature of the state law claims at issue, their ease of resolution, and the actual, and avoidable, expenditure of judicial resources," among other factors. *Timm v. Mead Corp.*, 32 F.3d 273, 277 (7th Cir. 1994). Given that the Government's federal claims have been dismissed before trial, and the ease with which an Illinois court can

address its remaining state law claims, this Court (absent viable federal claims) declines to exercise its supplemental jurisdiction over its remaining unjust enrichment and payment by mistake claims. Counts VI and VII of the JCI are dismissed without prejudice.

### E.    SAC Counts I through IV: Relators' FCA Theory

Relators base their FCA claims upon allegations that between August 2009 and October 2016, Defendants Walgreens and Kulekowskis routinely and systematically waived copayments for Medicaid and Medicare patients in an effort to induce: (1) patients to fill prescriptions at C&M; and (2) referrals of patients to C&M by providers. [65] ¶¶ 3, 73. Relators also allege that C&M provided remuneration to the Core Center by providing free pharmacy consultations. *Id.* ¶¶ 145−48. Pursuant to these allegations, Relators bring claims for violations of the FCA arising from violations of the Anti-Kickback Statute (AKS), 42 U.S.C. § 1320a-7b(b)(2) (Counts I and II) and violations of the IFCA arising from violations of the Illinois Public Assistance Fraud Statute (IPAFS), 305 ILCS 5/8A-3 (Counts III and IV). [65] ¶¶ 223−59; *see also United States ex rel. Sharp v. Consol. Med. Transp. Inc.*, No. 96 C 6502, 2001 WL 1035720, at *6−10 (N.D. Ill. Sept. 4, 2001) (recognizing a cause of action under the FCA predicated upon an AKS violation).[8]

Defendants move to dismiss Counts I through IV of the SAC because it: (1) impermissibly relies upon allegations pled on information and belief, [71] at 5−8; (2)

---

[8] The IPAFS contains "the same elements as the AKS, including unlawful renumeration." *United States v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443, at *9 n.7 (N.D. Ill. Apr. 14, 2014); *see also* 305 ILCS 5/8A−3. Thus, this Court will apply its AKS analysis to Counts I through IV of the SAC.

fails to allege copayment waivers with particularity, *id*. at 8−14; and (3) fails to allege the pharmacy consultations with particularity, *id*. at 14−15. This Court agrees with Defendants and finds that Relators fail to allege both copayment waivers and the pharmacy consultations with sufficient particularity under Rule 9(b). As such, this Court need not consider Defendants' information and belief arguments.

### 1. AKS Pleading Standard & Implied False Certification Theory

The AKS prohibits, among other actions, offering or paying any remuneration, including any kickback, bribe, or rebate, "to any person to induce such person to purchase . . . any good . . . for which payment may be made in whole or in part under a Federal health care program." *United States ex rel. Grenadyor v. Ukrainian Vill. Pharm., Inc.*, 895 F. Supp. 2d 872, 878 (N.D. Ill. 2012) (citing 42 U.S.C. § 1320a-7b(b)(2)), *aff'd*, 772 F.3d at 1109. Accordingly, to state such a claim, Relators must allege, with Rule 9(b)'s requisite particularity, that Defendants: "(1) knowingly and willfully (2) offered, paid, solicited or received (3) remuneration (4) in return for purchasing or ordering any item or service for which payment may be made under a federal health care program." *United States v. A Plus Physicians Billing Serv.*, 13 C 7733, 2015 WL 8780548, at *2 (N.D. Ill. Dec. 15, 2015) (citing *United States v. Omnicare, Inc.*, No. 11-CV-8980, 2014 WL 1458443, at *9 (N.D. Ill. Apr. 14, 2014)).

Like the Government, Relators fail to clarify whether their AKS claim rests upon an express or implied false certification theory. *See generally* [65]. As such, this Court finds the Seventh Circuit's decision in *Grenadyor* instructive. 772 F.3d 1102. There, the court explained that an implied false certification theory, based

upon waived copayments, would require the relator to allege:

> . . . that the government, had it known the defendant was billing Medicare or Medicare for drugs on which it had given kickbacks, would not have reimbursed it for any part of the cost of those sales. The theory treats a bill submitted to the government as an implicit assurance that the bill is a lawful claim for payment, an assurance that's false if the firm submitting the bill knows that it's not entitled to payment.

*Id*. at 1106. Here, as in *Grenadyor*, Relators allege that the waived copayments resulted in claims for reimbursement the Government would not otherwise have paid. [65] ¶ 193. Therefore, this Court treats Relators' AKS claim as an implied false certification claim.

### 2. Relators Fail To Allege Copayment Waivers With Particularity

#### a. Core Center Billing Group

Defendants argue that Relators fail to identify even one specific copayment that Defendants allegedly waived for the Core Center Billing Group, and thus that the SAC cannot satisfy Rule 9(b) particularity with respect to this billing group's allegations. Relators respond with two arguments, both of which remain unconvincing.

First, they argue that pursuant to *Presser*, a plaintiff need not present or even include allegations about a specific document or bill submitted to the Government to establish an FCA claim. [73] at 8–9. But as discussed above with relation to the Government's auto-refill claim, Relators misconstrue *Presser*. There, the Seventh Circuit explained that when relators lack access to the facts necessary to detail their claim, courts must relax 9(b)'s particularity requirement. 836 F.3d at 779 (citing

*Corley*, 142 F. 3d at 1051); *see also Lusby*, 570 F.3d at 854−55. Here, Relators concede that they base their allegations upon:

> the personal knowledge and observations of Relator Castillo-Baier, who worked in the C&M finance department and was trained in the procedures described and Relator Svendsen-Baier, who worked with Kulekowskis at C&M and was shown operating statements reflecting C&M's increased sales during Kulekowskis' tenure as store manager.

[73] at 3 n.1 (internal citations omitted); [65] ¶ 94 ("Castillo-Baier was responsible for default billing and, as part of her job duties, had to place patients into the proper billing groups."). Given Relators' concession that Castillo-Baier specifically worked in finance—the department upon which Relators' center its copayment waiver allegations—*Presser's* relaxed particularity standard does not apply. *See also Grenadyor*, 772 F.3d at 1107 (finding that to comply with Rule 9(b), relator—a pharmacist formerly employed with defendant pharmacy—"would have had to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback.").

Second, Relators maintain that the SAC includes an allegation of a specific false claim. [73] at 9. They point to portions of the SAC that walk through a particular Core Center patient's C&M Statement of Account (the Statement), [65-3], which they argue serves as an example of a "bad-debt" write-off for "a patient responsibility (i.e., copayment)." [73] at 9; [65] ¶¶ 127, 133−37. The Statement contains several entries showing a "WRITE OFF" for an undisclosed order based upon "Bad Debt." *See* [65-3] (entries for 3/27/13, 5/31/13, 7/31/13, 8/28/13, and 2/28/14).

For each of these "WRITE OFF" entries, the Statement listed the "Responsibility" as "Patient" rather than "Illinois Medicaid." *Id.* From this exhibit alone, Relators allege that the "write-offs of 'bad debt' for [the patient] were systematic and routine and based solely on [the patient] receiving treatment at the Core Center and being placed in the Core Center – Do Not Send billing group, which resulted in the patient never receiving a bill for copayments." [65] ¶ 137. This allegation contains several problems.

As an initial matter, Relators' use of the phrase "patient responsibility (i.e., copayment)" in the SAC indicates a fatal shortcoming—nowhere in the exhibit does the Statement clarify what a "patient" responsibility might include, and more specifically whether a "patient" responsibility always implies a copayment. *See generally* [65-3]; [65] ¶¶ 133−137. In fact, the SAC confirms that the term "patient responsibilities" encompasses more than just copayments. *See, e.g.*, [65] ¶ 128 ("As part of these monthly finance meetings, Kulekowskis would have Mok run monthly reports showing revenues and patient responsibilities (*including copayments*) for the two Do Not Send billing groups") (emphasis added). Further, as detailed below, the type of medication at issue constitutes a crucial question, because AIDS drugs do not require copayments. In other words, Relators give this Court no basis to infer that every time the Statement listed a "patient responsibility," it meant a mandatory copayment.

Further, even if this Court assumes that these patient responsibilities did constitute copayments, the Statement and SAC fail to allege any facts to indicate that

56

C&M waived them improperly. Pharmacies can waive copayments so long as:

> (i) the waiver is not offered as part of any advertisements or solicitation;

> (ii) the person does not routinely waive coinsurance or deductible amounts; and

> (iii) the person—

>> (I) waives the coinsurance and deductible amounts after determining in good faith that the individual is in financial need; or

>> (II) fails to collect coinsurance or deductible amounts after making reasonable collection efforts.

42 U.S.C. §§ 1320a-7a(i)(6)(A)(i)−(iii).

The Statement does not indicate, and the SAC fails to allege or otherwise imply, that Defendants failed to conduct a good-faith determination of the patient's inability to pay. *See* [65] ¶¶ 133−37; [65-3]. Relators also fails to indicate whether the waiver of five copayments over the course of 13 months and 130 total prescriptions (36 of which bear the notation "patient" responsibility) constitutes a "routine" waiver—a particularly problematic omission given that Illinois Medicaid covered the patient, suggesting financial need. *See* [65-3]; *Presser* 836 F.3d at 780 (affirming district court's dismissal of FCA claims for lack of particularity where relator failed "to demonstrate how defendant's policies compare[d] to other clinics or could otherwise be understood as 'unusual.'") Moreover, Relators fail to allege that that any one of the waivers in the Statement served as part of a broader advertisement effort in violation of the AKS. *See Grenadyor*, 772 F.3d at 1106 (affirming dismissal of copayment waiver allegations under the AKS in part because relator "alleged no

facts that would support his allegation that the waivers were advertised" and otherwise failed to show the copayment waivers were improper under the AKS). In short, as described below, Relators fail to link this patient's specific statement to any "specific allegations of deceit." *Dolan*, 2014 WL 3583980, at *3 (citing *Garst*, 328 F.3d at 378).

The parties also spend considerable time arguing whether the SAC alleges with particularity that Defendants advertised copayment waivers, and thus by extension whether Relators can link any deceitful conduct to a claim for payment. In their response memorandum, Relators point to numerous paragraphs within the SAC in an attempt to show Defendants' advertising efforts related to the alleged copayment waivers. [73] at 9–10 (citing [65] ¶¶ 93–105, 108–117, 126–37). But these paragraphs fail to satisfy Rule 9(b)'s particularity requirement.

For example, Relators allege that "patients in the Core Center of Chicago – Do Not Send billing group were never billed for copayments for covered prescriptions; instead, such required copayments were routinely and systematically waived." [65] ¶ 97. In support, Relators include an image of a screenshot and cite to a redacted accounts receivable report. *Id.*; [65-1]. But both the screenshot and report: (1) fail to include any mention of advertising; and (2) show only that a billing group titled "Core Center of Chicago – Do Not Send" existed. *Id*.

Further, Relators allege that the SAC pleads advertisement efforts based upon their allegation that "Kulekowskis told Castillo-Baier that Defendants had a deal with Core Center, and as a result the patients were not to be billed." [65] ¶ 105. But

the SAC fails to provide any support as to the who, what, when, where, and how of this deal. *Pirelli*, 631 F.3d at 441−42. Did Kulekowskis establish a deal with Core Center? What were the terms of any deal? When did the deal occur? How did the deal operate, and how did the parties to the deal advertise it, if at all? Absent additional support, a single allegation of a "deal" cannot satisfy Rule 9(b)'s heightened pleading standard.

Finally, Relators plead that based upon this "deal" conversation and "other" ambiguous allegations, "Relators believe and therefore allege that Core Center providers, including but not limited to Dr. Pamela Vergara Rodriguez and Nurse Practitioner Maureen Gallagher, effectively 'advertised' Defendants' practice of waiving copayments for Core Center patients, and referred patients to Defendants based on that practice." [65] ¶ 106. But Relators cannot satisfy Rule 9(b) by "effectively" pleading advertising; rather, they must allege actual instances of advertising with particularity.

True, Relators allege that a series of alleged conversations amounts to "word of mouth" promotion by practitioners. [65] ¶¶ 91−92, 122−24, 105, 155, 158, 161. For example, the SAC alleges that Castillo-Baier heard the head of C&M's HIV department, Pho, tell patients on the phone that there would be "no charge for your medication." [65] ¶¶ 87, 92. But Relators concede that the State of Illinois Cash, SNAP, and Medical Manual (the Manual) provides that there are "no copays for the following, even if they are provided to an adult . . . services paid by Medicare; and certain medications, including insulin, *AIDS drugs*, . . . and over-the-counter drugs."

59

[71] at 13; [73] at 13 (emphasis added).⁹  Given that Pho serves as the head of the HIV department at C&M, and the Core Center serves individuals with HIV/AIDS and other chronic infectious diseases, [65] ¶ 76, it would be unsurprising for Castillo-Baier to overhear Pho telling Core Center patients that they would not have to pay copayments, *id*. ¶¶ 91−92, and for Core Center patients to report that their physicians told them their medications would not require copayments, *id*. ¶¶ 122−124, 155.  The SAC gives this Court no indication as to whether or how Castillo-Baier or Pho distinguished Core Center patients with exempt AIDS prescriptions versus those with non-exempt prescriptions.  In fact, it fails to even mention the Manual or exemption.  *See generally* [65].

Simply put, C&M's copayment waivers, including the Statement attached as an exhibit to the SAC, could have "entirely innocent explanations."  *Presser*, 836 F.3d at 780; *see also Pirelli*, 631 F.3d at 444−45 (citing *Iqbal*, 129 S. Ct. at 1950 (courts should draw on "judicial experience and common sense" in determining whether a given claim is plausible)).  Thus, Relators fail to allege any advertisement efforts with particularity in connection with the alleged copayment waivers.

Because Relators fail to allege facts to link the Statement to any specific allegations of deceit, their copayment theory of FCA liability—with respect to the Core Center billing group—does not satisfy Rule 9(b).  *See, e.g., Dolan*, 2014 WL 3583980, at *3 ("Where an FCA claim is premised on the violation of [the AKS], the

---

⁹ This Court takes judicial notice of the Manual as a government document, available at: http://www.dhs.state.il.us/page.aspx?item=17633.  *Sleeter v. Actavis Totowa, LLC*, No. 10-653-GPM, 2010 WL 3781261, at *2 n.1 (S.D. Ill. Sept. 21, 2010) (citing *Laborers' Pension Fund v. Blackmore Sewer Constr., Inc.*, 298 F.3d 600, 607 (7th Cir. 2002)).

underlying violation must also be pled in compliance with Rule 9(b).") (citing *United States ex rel. Gross v. Aids Research Alliance-Chicago*, 415 F.3d 601, 605 (7th Cir. 2005)); *see also Grenadyor*, 772 F.3d at 1107 (relator could not satisfy Rule 9(b) particularity where he failed to allege whether customers who received kickbacks were Medicare or Medicaid recipients, and thus it was not clear whether the kickbacks at issue cost the government money or violated the AKS).

### b.    General Do Not Send Billing Group

As to the general "Do Not Send" billing group—which included Medicare and Medicaid patients not treated by the Core Center—Relators allege that: "Defendants (1) routinely waived the copayments; (2) did not make a financial hardship determination; (3) did not make a good faith effort to collect; and (4) continued to waive copayments indefinitely without determining whether the inability to pay was an isolated circumstance." [65] ¶ 179.  Defendants argue that the SAC fails to satisfy Rule 9(b), because it fails to identify of a single, specific patient or instance in which C&M waived a copayment for an individual in this group.  [71] at 11−12.

In response to this argument, Relators point to an "exhibit showing literally *hundreds* of patient accounts on the general Do Not Send billing group."  [73] at 12 (citing [65-2]).  Because the SAC alleges that "where applicable," C&M generally sent invoices for copayments to patients in that billing group, [65] ¶¶ 95−96, Relators argue that this allegation, together with the exhibit, suffices to allege an instance in which C&M improperly waived a copayment for individuals in this group.  [73] at 12.

Not so.  As *Grenadyor* made abundantly clear with respect to copayment-

related AKS claims, to "comply with Rule 9(b) Grenadyor would have had to allege either that the pharmacy submitted a claim to Medicare (or Medicaid) *on behalf of a specific patient who had received a kickback, or at least name a Medicare patient who had received a kickback*." 772 F.3d at 1107. Here, at most, Relators' exhibit demonstrates that hundreds of patients belonged to the general "Do Not Send" billing group. [65-1]. The SAC fails to allege that C&M waived a copayment, and thus submitted a false claim for payment, for any one of these specific patients. *See* [65] ¶¶ 95–96, 179–182. Rather it states only that "if a patient called to Defendants to say that the patient could not pay a particular individual invoice, the patient was permanently placed in the general Do Not Send billing group" and from that point on, "no good faith effort was made to collect any future copayments." [65] ¶ 180.

Absent any allegation as to: (1) who at C&M received these calls, or generally how Relators came in possession of this secondhand information; and (2) a specific patient, waiver, or claim, Relators' general "do not send" billing group allegations fail under Rule 9(b).

### c.    C&M's Pharmacy Consultations

Relators' final AKS theory relies upon its allegations concerning pharmacy consultations. The SAC alleges that approximately once a month, C&M paid Pho to travel to Chicago and provide free pharmacist consultations to patients, doctors, and/or nurses to discuss side effects or dosing issues with HIV medications. [65] ¶¶ 146–47. According to Relators, the "provision of free pharmacist consultations was a kickback designed to induce referrals of patients to Defendants, including patients

covered by the Government Healthcare Programs." [65] ¶ 153. Defendants move to dismiss, again based upon Rule 9(b) particularity. [71] at 14–15. This Court agrees, as Relators fail to come remotely close to alleging the "who, what, when, where, and how" of this alleged fraud. *Pirelli*, 631 F.3d at 441–42.

Relators respond that C&M used the pharmacy consultations as part of the "deal" to waive copayments and provide special treatment to Core Center patients, and thus the consultations were "tied to the provision of other services reimbursed in whole or in part by Medicare and Medicaid." [73] at 15. But Relators fail to offer any allegation, much less one with particularity, to make this connection. During what time period, or for how long, did these consultations take place "once a month"? Did C&M submit any claims for payment on behalf of a specific patient who received a consultation? Did C&M advertise the consultations? Relators have "not pled or argued that the answer to these questions is yes, and common sense says that the answer to each is likely no." *Pirelli*, 631 F.3d at 444–45 (internal citation omitted); *see also See, e.g.*, *Dolan*, 2014 WL 3583980, at *3 (citing *Gross*, 415 F.3d at 605).

And again, as with copayment waivers, the AKS allows free consultations provided that: (1) the items or services are not offered as part of any advertisement or solicitation; (2) the items or services are not tied to the provision of other services reimbursed in whole or in part by a government health care program; (3) there is a reasonable connection between the items or services and the medical care of the individual. 42 U.S.C. § 1320-7a(i)(6)(H). In fact, given that Pho led C&M's HIV department, it seems expected that she "would meet with patients to discuss side

effects or dosing issues with HIV medications" and "discuss similar issues with doctors or nurses." [65] ¶ 147.

Absent additional, particularized allegations, Relators cannot link a specific consultation to a specific claim for payment. Accordingly, this Court grants Defendants' motion to dismiss Relators' FCA and IFCA claims—Counts I through IV of the SAC—without prejudice.

## IV. Conclusion

For the reasons explained above, this Court grants Defendants' motions to dismiss, [68] [70], and dismisses the JCI [64] and SAC [65]. At the November 20, 2018 hearing, the Government declined an offer under this Court's standing orders to file an amended joint complaint in intervention addressing the issues raised in the motion to dismiss, [68], and conceded that it did not require any additional discovery or investigation. Relators have now amended their complaint twice. [65]. While this motion remained under advisement, neither the Government nor Relators requested leave to amend their complaints, sought to compel written discovery from Defendants, or otherwise requested the ability to take any depositions. Accordingly, if the Government or Relators intend to file any further amendments to their complaints, consistent with this order and the parties' Rule 11 obligations, they must do so within 21 days of this order. In light of the prior opportunities to amend and/or conduct discovery, and the parties' good-faith obligation to conduct a pre-filing investigation of this matter, any failure to replead within 21 days of this order will

result in conversion of the dismissal of the Government and Relators' complaints to a dismissal with prejudice.

Dated:  September 30, 2019

Entered:

_____

John Robert Blakey
United States District Judge